Our next case for argument is 23-1398 iRobot v. SharkNinja. May it please the Court, Lauren Degner for iRobot. iRobot proved conception under this Court's precedent, and the Court should reverse. iRobot presented inventor testimony describing the invention with particularity and also provided corroborating evidence, documents, and testimony showing that the inventor's story is credible. Am I right that the dispute here is about the corroboration? Predominantly, Your Honor. The Board also upfaulted some of the inventor declarations as well, but we think the declarations are clear in describing the conception of particular limitations 1D and 1E. I'm happy to start with the corroborating evidence. The Board found lack of conception as well. I'm not sure what's protected here and what isn't, but there are specific limitations where they found lack of conception, Appendix 20, as well as lack of corroboration. That's correct, Your Honor. The Board did fault the inventor declarations, and we would say that the criticism the Board levied on the inventor declarations for describing the conception story focused too closely on requiring the inventor declarations to parrot-slang language. If we look at paragraphs, for example, 27 of the Ozick Declaration and also 27 of the Vu Declaration, both of those paragraphs explain how the inventors conceived of detecting contact with charging terminals on the base station with reference to a charger available question function and then describe how the inventors conceived of stopping the forward movement of the robotic cleaning device in response to that detection of contact with the charging terminals in limitation 1E. So we would say the declarations that I just mentioned describe that conception story. They do not use claim language, but iRobot also put in a declaration of Dr. Hooper who marrowed up that story with the claim language in paragraphs 55 through 57 of his declaration. Your specification disclosed multiple environments, however, and the Board found that the statements you just referred to from the inventor were only talking about the unclaimed embodiment. So two responses to that, Your Honor. Yes, the Board did note that the specification discloses multiple embodiments, but the Board doesn't actually find that these statements in the declarations relate exclusively to, for example, the bumper theory, the bumper-depressed embodiment, and, in fact, when you drill down on the evidence itself, for example, the Exhibit 2013 talking about charger-available function and Exhibit 2016, the design strategies document, that specifically talks about determining when good contact is available. Those documents corroborate the inventor's testimony that they had also conceived of this idea of detecting good contact and then stopping. The testimony the Board cited and that Shark also relied upon from the inventor was dealing with a different source code file called docking.tl, not the user.tl that has this charger-available function, and it was improper for the Board to discount the user.tl file simply due to testimony about the status of a different source code file, docking.tl. Remember, we're talking conception. There's nothing that prevents inventors from having multiple ideas conceived and then working to reduce to practice writing source code files at different times. And so I think the Board also mixed up the notions of conception versus reduction of practice when it was looking at both the corroborating evidence. I guess my follow-up to that would then be, I think you want us to view this as a question of law. You say there's no doubt either about proof of conception as a matter of law, but your answer to my question makes it sound like the Board actually engaged in fact-finding, and perhaps your fact story was also supported by substantial evidence, but if the story that the Board credited, which is that your folks didn't actually conceive of the embodiment that was claimed at the pertinent time, there would be substantial evidence that we'd have to affirm that finding. Why is that not what's going on in this appeal? So first, we think the Board, from its opinion, illustrates that it applied the wrong legal test. It applied a too high a burden. It first was looking for specific claim language in the documents, and second, it was looking for the kind of detail that one would look for in connection with reduction to practice, not conception. Remember, conception is we look at the corroboration evidence to see if it lends credence to the invention story. And so we don't need the same level of detail. And so we think, as a threshold matter, the Board looked at the evidence through the wrong legal lens, which means there's a legal error. The evidence on the factual side, the evidence that was put forward, was really not countered. All the evidence in the record was from iRobot. And Dr. Hooper's, the expert's, interpretation of that evidence was undisputed. And so we understand, of course, that there are underlying factual considerations when considering conception and corroboration of conception. But here, given the nature of the evidence, and when one looks at the evidence through the proper legal test lens, we would say the Board error is a matter of law. One other point I'd like to make in terms of the Board's error in examining this evidence is the charger available function, that function in the code, and the user.tl, that function lends credence and corroborates the conception story by virtue of its very name. Its name doesn't, it's not alpha function, it's not bumper press function, and the name of this function, again, does what is required under this Court's law, which proves the truthfulness of the invention conception story. And so with that, I will turn, unless the Court has further questions on the conception grounds, I will turn to the Kim-Everett combination. This is a second batch of grounds. Actually, I'd like you to look at JA-6769. This is the task list, the software schedule and task list. Yes, Your Honor. I know it says confidential on the bottom, but I don't think anything I'm going to say breaches that. If I do, just wave your hands quickly or something. I don't know, stop me. So one of the things, am I right in remembering that the Board rejected this evidence entirely because it post-dated the critical date? That is my recollection as well, Your Honor. The Board did discount some of the evidence because of the date. And the date on this is what? This is a July 2003, and the date we're beating is in June. What's the date in June that we're trying to get? It is June, I think it's June 23rd, Your Honor. So you have to have conceived by June 23rd, and this document is dated early July, correct? Yes, Your Honor. And so the Board said this couldn't be considered for your conception because it was dated early July? That is right, Your Honor. Well, doesn't this document detail the drive-on charging and go through and explain the docking and in particular the making and detecting contact on page 6770? Yes, Your Honor. We completely agree with that. And so this document demonstrates that just days after the critical date when you're supposed to conceive, you have a software task list that has listed exactly this functionality as something that the code has to be written for. But clearly that means that at least as of two or three days after the critical date, they were already preparing to write the software that would be able to execute these functions. That's exactly right, Your Honor. And again, that highlights the Board's error in looking at each of the pieces of evidence it considered in isolation as opposed to looking at them collectively or looked at collectively. In addition to this piece of data, we see the source code. We see Exhibit 2016 that talks about making good contact. We see Exhibit 10 that specifically shows the configuration of the hardware of the base station at the two yellow square charging terminals. And so we agree with your point, Your Honor, that this is more evidence. Exhibit 10 has those two little teeth, right? Yes, those yellow teeth. They have to be – I mean, they're clearly the contacts. No question. They are the charging terminals of the base station. And collectively, this is all serving the function of corroboratory evidence, which is not to have every piece of – every claim limitation. It's not to be at the same level of detail as reduction of practice. So there's no doubt that User T.L. existed before the critical date because we have a last modified date on the file, right? That is correct, Your Honor. What does the testimony – how does the testimony explain what User T.L. actually does? Because, you know, I'm no source code expert. So how was the Board – so you proved that this file existed before the critical date, but what did that file itself teach the Board? Yes, Your Honor. So the OSIC declaration, Paragraph 27, I mentioned on Appendix 74, 49 through 50, explains in detail about that particular User.T.L. code. In specific, it says, for example, the behavior user charger would be activated if the Roomba 2 is connected to the charging contacts of the base station. Well, the one problem you have with this – I mean, I understand, but this is your – this is your expert, right? I'm sorry. I mean, this is not your expert. This is your inventor, right? That's true. The problem is the inventor can't explain that the source code supports his testimony because that's not actually – that's kind of circular. That doesn't feel corroborative, right? You need somebody independent to explain, don't you? Well, we have that as well, Your Honor, with Dr. Hooper. That's on Appendix 6648. He also goes through, for example, in Paragraph 56, goes through the user charge source code and explains the charge available function that outputs an indicator of whether a battery charger is on that page.  Excuse me. 6648.  And he is explaining this charge available function that outputs an indicator. And this is in the User.T.L. software. That is right. And he is a computer software expert who is qualified to examine the code. He was undisputed. There was no other software expert put into the record. He mentions, as I was saying, that – But why did the Board reject User.T.L.? The Board never mentioned Dr. Hooper's testimony at all. How about the User.T.L. source code? It rejects the User.T.L. soft code based on testimony about an entirely different file, docketing, docking.T.L., because the docking.T.L. source code, in the Board's opinion, hadn't been written yet to address this charger available function. But again, that's more of a production of practice issue. So this User.T.L. code should not have been rejected as failing to cooperate, given its date, given the nature of what it says specifically in the lines, the name of the charger available function, the stop all that's called immediately thereafter. It should not have been rejected. It was rejected entirely because of testimony about a different module, docking.T.L. Shark Ninja says you only relied on two documents before the Board. Is that correct? I would disagree with that, Your Honor. We cited – I mean, everything in the appendix that we cited in our brief was cited, and we put cites in the brief so you could marry that up. We disagree with that. We clearly cited the Hooper Declaration, and the Board was utterly silent on it. And if I may, I want to save time for Roboto. I will, Your Honor. Thank you. Good morning, Honors. May it please the Court. The primary issue here is that I, Roboto, is asking this Court to reweigh the evidence, make findings anew, rather than applying the appropriate test, which is to ask if the Board's decision is supported by substantial evidence. In doing so, it ignores critical evidence that supports the Board's decision. And there's no better example of that than the testimony of Mr. Ozick, one of the inventors of the 423 patent. He specifically testified about this charger available function in two separate depositions in two separate cases, once in a BDAP, once in an ITC. And both times, he was consistent. When he was asked about this charger available function, he explained from the robot's perspective, it doesn't really explain how it works. It doesn't matter if the user plugs it in or if there's some other method of finding if the charger's available. It doesn't actually talk about how it makes the determination. When asked in his PTAB deposition, he later testified, the code file doesn't actually explain how the charger available function works. And that's important because the claims require a specific way of determining when docking's complete. It detects when the contact of the charging terminal, so it stops the response to that detection. And by Mr. Ozick's own testimony, that code doesn't show that. It doesn't show how that function's being performed. And his testimony is Appendix 5135-4391. And the Board expressly relied on Mr. Ozick's testimony when discussing this issue. Well, here's the problem. Source code often doesn't explain or define things, right? I mean, that takes an expert to look at the code and understand how it works. I mean, I guess I don't read the Board's footnote. The only thing you're talking about, unless I'm mistaken, is footnote 14 on page 16 of the Board's opinion. Is that right? Yes, Your Honor. Okay. So, source code often doesn't explain. It's code. Like, they don't document it. You don't usually have comment bubbles on the right that says, here's what this macro does or here's what this module performs. So, I mean, the fact that Mr. Ozick said there's no explanation in the source code itself doesn't mean that a skilled artisan reading that code wouldn't understand how it operates. So, I guess I'm confused at this point because I – look, I think you've got a strong case on corroboration, and I'd love to talk about it with you, but I think you've got a very weak case on conception. I think Paragraph 27 of the Ozick Declaration clearly establishes conception of the relevant functionality. So, try and tell me what's wrong with my Paragraph 27 assessment for conception purposes, and then I'll let you move on to corroboration. It's not all bad for you today, but I do – I don't – I'm really struggling with how the Board came to the conclusion there's no conception. Sure, Your Honor. So, I'll take a look at Paragraph 27 of Mr. Ozick's Declaration. That's in Appendix 14. And there she talks about – Sure, where do you want me to look at? It's Appendix 14. Appendix page 14. It's quoted – sorry, quoted in the Board's decision, the Board closed Ms. Booth's Paragraph 27. Okay. And there it says, talking about this charger available, it refers to a function that outputs an indicator of whether a battery charger, such as a base station, is electrically connected. And so there the testimony is talking about the result, an output of something that's happening. And it doesn't say how that output is actually figured out. It doesn't say what logic is going through to figure out if it's actually connected. And I think the language here, which is very general and says a battery charger, such as a base station, shows that it recognizes that the code here isn't specific to detecting contact with the charging terminals. The Board didn't make any of those findings. Everything you just said is, like, wonderful technical stuff, but those weren't findings made by the Board. You're now offering an alternative rationale that I should conclude the Board's opinion is right, but not supporting the Board's rationale. Try to stick to the Board's rationale. Sure. Well, I do think that the Board's rationale is supported by what I was just saying because it does say that the testimony there doesn't actually talk about detecting contact with the charging terminals. An issue with the testimony is it's more general. And I think that this goes to – My other problem with this is that you're also, right now, getting me at Penix14 to look at the Vu Declaration. I agree. The Vu Declaration is less strong by a lot on conception. But what I told you, for me, was the problem is Ozic, who's one of the inventors, it seems in paragraph 27 that he clearly and unequivocally articulates conception. So you pointing to the fact that Vu doesn't quite meet the standard for conception doesn't help me figure out why Ozic doesn't. Sure. Understood, Your Honor. And moving to Mr. Ozic, I agree it presents a closer case. There, though, he still said the behavior user charge would be activated if the robot is connected to the charging contacts without really explaining what analysis the robot's doing to figure out if it's connected. And that was the issue, I think, with what the Board took with his testimony, which it doesn't actually say what the robot's looking at, how it's determining it's connected. And I think that goes to the corroboration point as well, if I can address that, because I think Well, it says if it's connected to the contacts. It says connected to the contacts, right? Then it would stop the movement. I mean, I think that sentence is pretty unambiguous. Should we move to corroboration? Sure, we absolutely can. Okay, let's move to corroboration. Okay. Turning to corroboration, you know, again, looking at If you want to say anything else about conception, I don't want to cut you off, but The only other thing I would say about conception is just the fact that you've achieved contact doesn't meet the claims, because the patent talks about these other embodiments and recognizes there are different ways to know that when you're finished talking. And those different ways still result in contact with the charging terminals. And so what's important is how you figure out when you've completed, and the patent claims to one specific way. So that's the last thing I would say on that. But I agree, I would like to touch on corroboration. And I think it raises a lot of the same issues. Merely, you know, exemplary because the discussion from inventors are intertwined with the corroboration documents when they're discussing conception. So it's kind of intermixed here. The only, the document, and I'm just going to get you right to what bothers me, Hooper, like what do you do with Hooper? Hooper is purporting, and he is an expert, not one of the inventors. So to the extent that Ms. Degman was pointing at an inventor's explanation of what user.tl does, I'm throwing it out. That's not corroboration. That's a circular reasoning problem. But Hooper, Hooper is an expert that is supposedly on, I guess, page 6648 of the appendix going through user.tl and explaining how he as a software expert understands it to operate. The board never addressed it. What do we do about that? Sure. I think, Your Honor, it's important to look at what Dr. Hooper actually says, which is not very much. He, if you compare his testimony at appendix 6648 discussing the source code, for instance, he, comparing the testimony from him and Ms. Vu, they're nearly identical. Mr. Hooper doesn't provide any of that. But I won't rely on Ms. Vu because for the same, you know, again, you can't help yourself with stuff you can't help yourself with, right? Ms. Vu is one of the inventors. She can't corroborate her own testimony. So who cares what she said? But Mr. Hooper is not one of the inventors. Sure, yeah. And, Your Honor, I think this goes to, A, an issue of re-weighing the testimony, and perhaps the Board could have relied on Dr. Hooper or it could have relied on Ozick's testimony. In Dr. Ozick's testimony, he was personally involved with this code. He knows about it, and he testified specifically that it doesn't tell you how it works, and he can't tell how it works. And so I think that's important here because they have personal knowledge of this material. They worked on this code, and I don't think we should discount the adverse testimony from these inventors merely because they're inventors. Certainly, if it was testimony of an interested party in their favor, we would see a reason to discount it. But here where the inventor testifies against their interests and talks about the fact that the code doesn't actually show how it operates, I think that's important testimony the Board was entitled to rely on and certainly supports the Board's decision. Okay, so this is the one piece that we talked about a minute ago with regard to that footnote 14 that I'm still struggling with. You're saying the Board found the code doesn't show how it operates, and I don't see the Board having found that. I see the Board explaining that Mr. Ozick's testimony was there's no explanation or definition in the software file about what the macro's function is, but that to me is commentary, nomenclature. You know, like some coders put fluff in their code, right, which is it's really tags so that the user can understand what's happening here, and other software doesn't. It just performs the function. I guess I'm wondering, do you think the Board made a fact finding that Mr. Ozick testified that this user TL software does not disclose this or it just doesn't explain it? Do you understand the difference I'm trying to draw? I'm just trying to understand exactly what the Board's fact finding is. Yes, I think the Board made a fact finding that it doesn't disclose this. You think that's all in footnote 14, that one sentence? That's the sentence? I agree, yes, Your Honor. And I think we have to look at the testimony it cites in support of that. Where is that testimony? Sure. And so we can look at the testimony of appendix 4391. And here he was asked about the charger available macro or function. Sorry, I'm trying to get there. Got it. And he agreed that it's not defined. He agreed that the file doesn't explain how the charger available macro or function works. It's simply silent on how it operates. And all it says is charger available. We have to look somewhere else to find that. And I think, also, although the Board didn't cite it, there's additional record evidence of Mr. Ozek's testimony that's very pertinent here. And that's appendix 5135. And there he talks about the function, this charger available function. He said it looks like it just takes control of the robot when there's a charger present, plugged in, or perhaps docked. I'm sorry, what page are you wanting me to look at now? I'm just trying to find it. Yes, you are. 5135. You acknowledge the Board didn't cite that testimony. Can we really credit it? I think so. It supports the Board's decision, and we can look at the entire record to see if the conclusions by the Board are supported. And I think this firmly supports it. Here he says it just takes control of the robot when there's a charger present, plugged in, or perhaps docked. And he was asked, do you know, looking at this code, whether the robot would have been plugged in or docked? And he responds that, from the robot's point of view, they're the same. At an abstract level, whether it's plugged in or sitting in the docks, it's the same thing. And he would have to look elsewhere to see how it actually operates. So I don't know what I'm supposed to take away from 5135. It looks like the answer he gave is, I can't answer the question of that, and this is exactly what my concern was with footnote 14, that I can't answer the question of a definition of the charger available macro. And he says, unless I could read the whole code, because then I could guarantee I'm getting it right. So what I understand he's saying is that the face of the code doesn't tell somebody who's just looking at it. A software programmer would have to really track, would have to wind their way through the code in order to understand what it does. Right, and the issue is that the robot never provided the code that shows how it actually works. This charger available function is just... I thought user.tl was disclosed. User.tl is disclosed, but the code of how charger available... Is that that code? It's a different code that was never provided, and it's undisputed it wasn't provided. The charger available is essentially like looking at an index in a book. You can see what the chapter's name is, but if you want to see what happened in that chapter, you have to go to the chapter and read it. And we never got the code to show how you read it and what it does and what happened there, and that's undisputed in the hearing before the PTAB. Iowa's attorneys admitted that that wasn't present, it wasn't produced. And so we have just the word charger available question mark. So this is helpful. So what you're telling me is that in this case, Mr. Ozick couldn't explain that what the software disclosed, and you're saying that that's because the relevant software macro was not ever disclosed. The source code for the relevant software macro was never disclosed. So we know we have the label, like insert macro here, but we don't have what the source code is, and your side was never given a chance to look at it, but obviously they had an expert. Did their expert look at it and opine on it, Mr. Hooper? No, Your Honor, it was never provided. To this day, it was never given to us. So all we know is that they were looking, is a charger available? How they figured that out, or if they had even figured out how they wanted to do it, was never disclosed. And so that's the issue. They're trying to say that they conceived of this by this particular date, this code supports them, but the code is just a black box. It just says, hey, here's something that will tell you if the charger's available. And Mr. Ozick said, well, if I want to actually figure out how it does that, I'd have to look and see where it's defined, and that wasn't provided, and that's the issue. The Chief Judge asked your friend on the other side about a document that begins at age 67, 69, a software task list and schedule. Do you have anything to say about that? Yes, Your Honor. I don't believe that the Board made a finding about this document because I don't believe either one actually cited this document as corroboration for conception before the PTAB. And so, you know, this is a new argument that was raised on appeal. Certainly they cited this document in other parts of the brief, you know, for background or other limitations, or perhaps for diligence, but they don't cite this document before the Board for conception and reduction of practice of this limitation. And so I don't believe the Board made a finding on this. We argue that it postdates it, but certainly we don't have the Board's input on this because they and whoever raised this before the Board for this issue. And, Your Honor, if I may just briefly touch on the other document that they addressed because I think it is important. Again, they talk about this Roomba Design Strategies document that talks about DOC on charging. And so briefly, Your Honor, the issue here is the Board made certain findings about this document, and there's testimony that supports the Board's findings. And I think one critical part of the Board's finding is that the document talks about a logic input, but doesn't actually say what it's doing, what logic it's following, how is it actually determining that the charge is available. It doesn't show that, just like the code didn't. And the Board found that it doesn't disclose that, and says there is also reference to the Roomba in charging recognizing the document has been achieved, but there's no indication as to how this recognition is accomplished. And Mr. Cross, an engineer by robot at Appendix 4267, agreed that it's silent as to what's driving that input, how it's working, and that directly supports the Board's decision. And also, Ms. View's testimony at Appendix 4744 to 4745, she testified that she can't conclude. You're right. Thank you, Your Honor. And I'll rest on our briefing for a moment.  May it please the Court. Let me start with some corroboration, because I know there's some concerns with corroboration. First of all, I will say, under Chenery, the Court can't rely on the portion of the record that the Board didn't cite on Appendix 5135. Focusing on the main argument, is that the evidence, the source code, does not say how the detection is. I would remind the Court that the claims also do not recite very specific details on how this detection is made. And so when we're, you know, this sort of is a false requirement to have to show the level of detail that's not even recited in the claim. Moreover, when we look at the appendix, the evidence, and I want to just focus just a moment on Exhibit 2016. This is on Appendix 6765. This is the Design Strategies document. It could not be more clear that what was being discussed in this document is that whether the external charger is available, i.e., when good contact has been made. So when we look at this about charger being available because there's good contact, the only interpretation of this that makes sense, which is completely backed up by Dr. Hooper, is that it's electrical contact. And just at the second sentence in Paragraph 57 of Dr. Hooper's declaration on Appendix 6648, he explains that this description I just read indicates that the ruler would stop its forward movement to the dock at the charger when it detects contacts with the charging terminal on the base station. This is evidence that was before the board. The board discounted this evidence using, we would say, an incorrect legal test requiring too much detail for conception, which is ultimately just looking to see if the inventor's story is credible. And given my time has expired, I will sit down and list your questions. Okay. I thank both counsel. This case is taken under submission. Both counsel have an excellent mastery of the record. Thank you.